<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| VITO MAZZOCCOLI, M.D., <br><br> Plaintiff, <br><br> v. <br><br> MERIT MOUNTAINSIDE LLC, et al., <br><br> Defendants. | Civil Action No. 12-2168 <br><br> **OPINION** |

This matter comes before the Court by way of motions to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Defendants Merit Mountainside LLC d/b/a Mountainside Hospital ("Merit"), Theresa A. Soroko, M.D.,[1] Robert Brenner, M.D. and AHS Hospital Corp./Mountainside Hospital Campus ("AHS")[2] [Docket Entry Nos. 10 and 11]. The Court has considered the submissions made in support of and in opposition to the instant motions. No oral argument was heard. Fed. R. Civ. P. 78. Based on the reasons that follow, Defendants' motions to dismiss are granted.

---

[1] Defendant Soroko is represented by Bubb Grogan & Cocca, LLP for events which allegedly occurred prior to June 1, 2007 and by the law firm of Brach Eichler for allegations occurring after that date.

[2] Although AHS Hospital Corp./Mountainside Hospital Campus ("AHS") was not listed as a Defendant to this action in the Amended Complaint, it explains that "prior to June 1, 2007, Mountainside Hospital was owned and operated by AHS during which time Dr. Brenner was an administrative employee of AHS and Dr. Soroko was a member and officer of the 'medical staff.' AHS sold Mountainside Hospital to defendant Merit Mountainside LLC ("Merit") in a transaction which closed on or about June 1, 2007, terminating AHS's involvement in the operation of that hospital. The allegations in this action presently span from 2003 through 2011 and therefore cover years when Mountainside Hospital was owned and operated by AHS, as well as years when Mountainside Hospital was owned and operated by Merit." (AHS Br. at 1-2).

## BACKGROUND[3]

Plaintiff, Dr. Vito Mazzoccoli, is a physician licensed by the State of New Jersey. He is a solo practitioner with a principal place of business at 73 Bloomfield Avenue, Bloomfield, Essex County, New Jersey 07006. (Am. Compl., ¶16). Plaintiff has been a Fellow of the American Academy of Family Physicians and has more than 20 years of practice as a researcher, surgeon, and primary care physician. (Am. Compl., ¶19). His research and writings have been published in multiple languages in scientific journals in both the United States and Europe. (Am. Compl., ¶20).

Plaintiff holds full unrestricted privileges in the Department of Family Medicine of the following hospitals: Morristown Memorial, Clara Maass Medical Center, Meadowlands Hospital Medical Center, Columbus Hospital LTACH, and Saint Barnabas, where he is the Associate Clinical Chairperson of the Department of Family Medicine. (Am. Compl., ¶17). Plaintiff also holds full unrestricted admitting privileges in the following nursing homes and rehabilitation facilities in New Jersey: Canterbury (Cedar Grove), Cedar Hill (Cedar Grove), Clara Maass Continuing Care, Crane's Mill (West Caldwell), Green Hill (West Orange), Stratford Manor (West Orange), Van Dyk (Montclair), West Caldwell Care Center (West Caldwell). (Am. Compl., ¶18).

In December 2003, Plaintiff was granted privileges at Mountainside as an attending physician in the Department of Family Practice. (Am. Compl., ¶38). Plaintiff alleges that Defendant Dr. Robert Brenner ("Brenner") was the Chairman of the Department of Family Practice, Director of Business Development, and one of the hospital's senior administrators when Plaintiff joined Mountainside. (Am. Compl., ¶47). Plaintiff alleges that Brenner was "unhappy"

---

[3] The following relevant facts are alleged in the Amended Complaint and accepted as true solely for purposes of this motion.

when Plaintiff joined the hospital because Plaintiff was not placed under Dr. Brenner's direct supervision. (Am. Compl., ¶49). Furthermore, Plaintiff alleges that Brenner "singled [Plaintiff] out" in numerous ways such as: berating Plaintiff with bizarre accusations in his office, threatening to report Plaintiff to committees for allegedly baseless crimes, harassing Plaintiff at every opportunity, threatening to throw Plaintiff out of the hospital by any means necessary, and keeping Plaintiff from the emergency room roster for about a year. (Am. Compl., ¶¶ 49-53).

Around March 2005, Plaintiff reached out to Dr. Eugene Pugatch ("Pugatch"), the President of the Medical Staff Office at Mountainside. (Am. Compl., ¶54). Plaintiff described Brenner's accusations and harassment to Pugatch. (Am. Compl., ¶54). Pugatch allegedly advised Plaintiff that he could either appoint a committee to investigate Plaintiff's complaints against Dr. Brenner or personally intervene on Plaintiff's behalf. (Am. Compl., ¶54). Plaintiff chose the latter option and Dr. Brenner eventually apologized. (Am. Compl., ¶55-56).

The Amended Complaint alleges that after his apology, Dr. Brenner launched an offensive campaign against Plaintiff. (Am. Compl., ¶56). This campaign allegedly consisted of Dr. Brenner encouraging nurses, aides, case managers, social workers, and others to report on Plaintiff's every action. (Am., Compl., ¶56). Throughout this campaign, Dr. Theresa Soroko ("Soroko"), Dr. Brenner's "most prominent and partisan conspirator," made it known that Plaintiff—whom she had never met—should have been thrown out of the hospital for complaining about Brenner, should have lost his medical license and should, instead, "earn his living by panhandling on the streets." (Am. Compl., ¶¶ 56-57).

In February 2006, Brenner filed a complaint with Mountainside's Medical Staff Office alleging, *inter alia*, that Plaintiff had fraudulently backdated notes in a patient's chart. (Am. Compl. ¶58). Pugatch then appointed a committee to investigate Brenner's allegations. (Am.

3

Compl., ¶¶ 59, 60). The investigation found that Plaintiff incorrectly entered a date on the patient's chart by erroneously dating notes with the dates the notes referred to rather than the dates the notes were made. (Am. Compl. ¶61). Dr. Mazzoccoli had misunderstood the dating protocol. (Am. Compl., ¶ 64). The committee ordered that Plaintiff's charts be supervised for six months. (Am. Compl. ¶64). No further record keeping errors were detected in Plaintiff's records. (Am. Compl. ¶72). Nevertheless, Dr. Brenner insisted that Dr. Mazzoccoli should have had his privileges withdrawn and should be reported for criminal Medicare fraud. (Am. Compl., ¶ 66). Plaintiff also alleges that Brenner slandered Plaintiff at social events involving Mountainside physicians in an attempt to formulate ill will towards Plaintiff. (Am. Compl. ¶69).

After Brenner's conduct was criticized, he resigned from Mountainside. (Am. Compl. ¶70). Allegedly, Dr. Soroko was distraught about Brenner's departure and blamed Plaintiff. (Am. Compl. ¶71). On January 1, 2007, Dr. Durgesh Mankikar ("Mankikar") succeeded Pugatch as President. (Am. Compl., ¶73). Allegedly, Dr. Mankiklar invited Plaintiff to a "friendly meeting" at the hospital that occurred on February 2, 2007. (Am. Compl., ¶74). Dr. Soroko, now Vice President of the Medical Staff Office, attended this meeting. (Am. Compl., ¶74). During this meeting, Plaintiff was informed that due to some alleged undefined deficiencies in his recordkeeping, the supervision of Plaintiff's charts would be reinstated for another six months. (Am. Compl., ¶75). Plaintiff alleges that Soroko's demeanor during the February 2, 2007 meeting suggested that she was the "mastermind" behind the extension of Plaintiff's supervision period. (Am., Compl. ¶76). Shortly after this meeting, Plaintiff met with Dr. Mankikar. (Am. Compl., ¶78). Allegedly, Mankikar could not explain why the Medical Staff Office extended Plaintiff's supervision period, but stated "You are going to have problems

4

with *them*. I am trying my best to try to help you, but now *they* found another case against you." (Am., Compl., ¶78).

On February 4, 2007, Plaintiff was informed that he was to be the subject of a "peer review" on April 4, 2007 based upon unspecified complaints. (Am. Compl., ¶80). On March 8, 2007, before the peer review took place, attorneys for Atlantic Health System reported Plaintiff to the New Jersey State Board of Medical Examiners ("NJSBME"). (Am., Compl., ¶83). Plaintiff alleges that, because the hospital refused to give him information concerning the reasons for the complaints, he did not participate in the peer review. (Am. Compl., ¶81). On April 21, 2007, Dr. Mankikar allegedly advised Plaintiff that an investigating committee would proceed with another investigation into unspecified charges unless he immediately relinquished his privileges at Mountainside. (Am. Compl., ¶86). Plaintiff also alleges that Mankikar told him that any negative findings would be reported to the NJSBME, which could result in Plaintiff losing his medical license. (Am. Compl., ¶87). Plaintiff declined to relinquish his privileges. (Am. Compl., ¶ 88).

According to the Amended Complaint, Dr. Mankikar was fired in or around April 2007 and Dr. Soroko became President of the Medical Staff Office. (Am. Compl., ¶ 89). "On the heels of Soroko assuming presidency," another investigating committee was created in April 2007. (Am. Compl., ¶ 90). The committee issued a report on May 14, 2007, concluding that there was insufficient evidence to support allegations that Plaintiff had backdated medical records. (Am. Compl., ¶ 91).

The committee engaged in a second investigation concerning's Dr. Mazzoccoli's care of an elderly patient; no action was taken against Dr. Mazzoccoli by the committee with respect to either investigation. (Am. Compl., ¶ 92-92). Notwithstanding the foregoing, Dr. Soroko insisted

that Plaintiff "undergo anger management and attend medical recordkeeping, professionalism and ethics training" in or around July 2007. (Am. Compl., ¶ 95). Plaintiff agreed with these demands to allegedly diffuse Dr. Soroko's animosity. (Am. Compl., ¶ 97). The Amended Complaint alleges that Dr. Soroko developed an irrational, vindictive obsession with Plaintiff because she blamed him for Dr. Brenner's departure. (Am. Compl., ¶100). As a result, it is alleged that Plaintiff began to suffer from mental and emotional distress, anxiety, panic attacks, fear, sleeplessness, and similar symptoms. (Am. Compl., ¶102).

In or around February 2008, Dr. Soroko sent a letter to the investigating committee concerning an allegation that Plaintiff had once again backdated medical records, along with another incident of inappropriate conduct. (Am. Compl., ¶108). Later that month, Dr. Dadaian ("Dadaian"), the Chairman of the investigating committee, responded: "I had the opportunity to review a letter from [Soroko]… directed to your office. In her letter, there was a reference to a 2007 investigation concerning the backdating of medical records. I was Chairman of the investigating committee and the decision by the committee was that there was no evidence to document the backdating of medical records. *Therefore, her statement is inaccurate*." (Am. Compl., ¶ 109).

On January 21, 2008, the President and CEO of Mountainside Hospital notified Dr. Mazzoccoli that a recommendation had been made to revoke his staff membership and privileges because he had failed to undergo anger management as directed by Dr. Soroko. (Am. Compl., ¶ 111). Dr. Mazzoccoli was subsequently removed from Emergency Room on-call roster for a period of six months. (Am. Compl., ¶ 115).

In or around April 2010, while making rounds at the hospital, Dr. Mazzoccoli visited a 92-year old female patient who was in kidney failure and developed a serious decubitus ulcer on

her sacrum.  (Am. Compl., ¶119).  A nurse's aide and student were in the room while Plaintiff discussed having surgery with the patient.  (Am. Compl., ¶ 121).  Although the patient was allegedly scheduled for surgery, she was now refusing to give consent.  (Am. Compl., ¶ 120).  The Amended Complaint alleges that, in an attempt to persuade the patient to proceed with the surgery, Dr. Mazzoccoli joked that the procedure was less complicated than a breast implant or facelift.  (Am. Compl., ¶ 123).  The patient eventually agreed adding, "I don't know how I let you talk me into these things."  (Am. Compl., ¶ 124).

After obtaining the patient's consent, Dr. Mazzoccoli left the patient's room.  Following Dr. Mazzoccoli, the nurse's aide called out to him: "why would you mention a breast implant to such an old woman. . . If she was young like me, I would have understood."  (Am. Compl., ¶ 126).  Plaintiff responded: "No, I was not mentioning that to propose she have a breast implant.  Why?  Are you thinking of having a breast implant?"  (Am. Compl., ¶ 126).  The Amended Complaint alleges that the aide became angry and walked towards Dr. Mazzoccoli with her hands on breasts saying: "I don't need a breast implant.  See, this is all mine, it's natural." (Am. Compl., ¶ 127).  "Thinking he might have offended her, Dr. Mazzoccoli walked a few steps back and apologized to the aide, touching her briefly on her ribcage at the moment he apologized."  (Am. Compl., ¶ 128).  Another nurse witnessed this exchange from the down the hall and admonished the aide by saying: Why are you letting him touch you?"  (Am. Compl., ¶ 129).  The aide allegedly responded: "It's good, we're friends." (Am. Compl., ¶ 129).

Later that afternoon, it is alleged that Dr. Mazzoccoli received a call from Dr. Soroko; the aide had accused him of "grabbing, fondling and/or kneading her breasts during their verbal exchange in the hospital corridor." (Am. Compl., ¶ 130).  Dr. Mazzoccoli's privileges at Mountainside Hospital were summarily suspended on or around April 19, 2012 and the matter

was reported to the National Physician Databank as "sexual misconduct." (Am. Compl., ¶¶ 136-138).

In light of the foregoing, Plaintiff, proceeding *pro se* in this matter, filed the initial complaint in this matter on April 11, 2012.[4] An Amended Complaint was filed on April 25, 2012. This Court's jurisdiction over the Amended Complaint is premised on federal question, 28 U.S.C. § 1331,[5] and supplemental jurisdiction, 28 U.S.C. § 1367. Plaintiff's Amended Complaint asserts the following claims: (1) violation of 42 U.S.C. § 1985(3); (2) unreasonable restraint of trade, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; (3) violation of N.J.S.A. 2A:47A-1 ("False complaints of unprofessional conduct"); (4) negligent and/or intentional infliction of emotional distress.; and (5) a declaration of rights pursuant to 28 U.S.C. § 2201.

## **LEGAL STANDARD**

For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint,[6] a court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See*

---

[4] It appears that Plaintiff also filed a complaint against the nurse's aide in the Superior Court of New Jersey in December 2011. (Am. Compl., ¶ 147).

[5] Although Plaintiff's Amended Complaint makes reference to "28 U.S.C. § 1131" and not § 1331, the Court will assume that such was a typographical error. In addition, although Plaintiff's Amended Complaint makes no reference to 28 U.S.C. § 1367, the Court will assume that its reference to "supplemental jurisdiction over any pendant state law claims" is premised on this section.

[6] The Court construes the Amended Complaint liberally in favor of the Plaintiff, given Plaintiff's *pro se* status. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *United States v. Day*, 969 F.2d 39, 42 (3d Cir. 1992).

*Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). Finally, to survive a Rule 12(b)(6) motion to dismiss, allegations of conspiracy must provide "some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. Supreme Court of New Jersey*, 588 F.3d 180, 184 (3d Cir. 2009).

## ANALYSIS

1.   **Count One – Section 1985(3) Claim**

Count One of Plaintiff's Amended Complaint alleges that Defendants, by "engaging in fraudulent, unlawful peer reviews; by engaging in anti-competitive acts; by conspiring to slander his personal and professional reputation; and by seeking to deprive him of his good name and livelihood," conspired to deprive Plaintiff of his civil rights in violation of 42 U.S.C. § 1985(3). (Am. Compl., ¶¶ 154-155). The Amended Complaint further alleges that "[t]he motivating force behind these malevolent acts was precisely the invidious discrimination to which § 1985 relates." (*Id.*, ¶ 156).

Section 1985(3) prohibits conspiracies directed at "depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To state a claim under section 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal

9

protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States. *See Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) (citations omitted). "Thus, § 1985(3) defendants must have allegedly conspired against a group that has an identifiable existence independent of the fact that its members are victims of the defendants' tortious conduct." *Farber v. City of Paterson*, 440 F.3d 131, 136 (3d Cir. 2006). The Third Circuit has explained:

> This independent existence is necessary to preserve the distinction between two of the requirements of a § 1985(3) claim: that the conspirators be motivated by class-based invidiously discriminatory animus and that the plaintiff be the victim of an injury he or she seeks to remedy by means of § 1985(3). If merely alleging the latter could satisfy the former, "the requirement of class-based animus would be drained of all meaningful content," and would transform § 1985(3) into the "general federal tort law" Congress did not intend to enact.

*Id.,* 440 F.3d at 136; *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) ("Whatever may be the precise meaning of a 'class' for purposes of *Griffin's* speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors.").

Plaintiff's Amended Complaint fails to allege, with sufficient factual support, Plaintiff's membership in a class of individuals who have been subjected to "historically pervasive discrimination." *See Magnum v. Archdiocese of Philadelphia*, 253 Fed. Appx. 224, 230 (3d Cir. 2007) (noting that "§1985 protects 'victims of historically pervasive discrimination' and those with 'immutable characteristics' ") (quoting *Carchman v. Korman Corp.*, 594 F.2d 354, 356 (3d Cir. 1979)). Nor does the Amended Complaint properly allege any *class-based* invidious discriminatory animus by any of the Defendants. *See, e.g., Farber*, 440 F.3d at 136 ("In order to

10

ensure that a § 1985(3) class has an independent identifiable existence, a reasonable person must be able to 'readily determine by means of an objective criterion or set of criteria who is a member of the group and who is not.' For example, 'women,' or 'registered Republicans,' may constitute an identifiable 'class' as opposed to a more amorphous group defined by 'conduct that the § 1985(3) defendant disfavors,' such as 'women seeking abortion,' or 'persons who support [political] candidates' "). Having failed to allege, *inter alia*, membership in a group that has been subjected to "historically pervasive discrimination" ***or*** any facts even suggesting that Defendants were motivated by *class-based* invidious discriminatory animus, Plaintiff has failed to state a viable section 1985(3) claim.[7] *See, e.g., Coles v. Carlini*, No. 10–6132, 2012 WL 1079446, at *14 (D.N.J. March 29, 2012) (dismissing section 1985(3) claim after finding that "invidious class-based discrimination is not at issue and there are no allegations involving a protected class."). This claim is therefore dismissed without prejudice.[8]

### 2.	Count Two – Sherman Act Claim

#### A.	Section 1

The Court construes Count Two as alleging unreasonable restraint of trade, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Section 1 of the Sherman Act provides that:

---

[7] Having found that Plaintiff has failed to allege a viable section 1985(3) claim, the Court declines, at this time, to address the statute of limitations argument raised by Defendants. Defendants are free to renew such arguments to the extent Plaintiff chooses to amend this claim to cure the pleading deficiencies discussed above.

[8] To the extent Plaintiff chooses to amend this claim, the Court also notes that "in the context of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel," neither of which are implicated in Plaintiff's Amended Complaint. *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 278 (1993)).

11

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1. The Third Circuit has explained that there are four essential elements of a § 1 violation:

> (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action.

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997). Moreover, "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy,' '[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553; *see Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994) ("The very essence of a section 1 claim, of course, is the existence of an agreement. Indeed, section 1 liability is predicated upon some form of concerted action."). As a result, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.

    B.    **Antitrust Injury**

A private plaintiff must also allege an antitrust injury in order to properly assert a claim for relief under the Sherman Act. *See Allen-Myland, Inc. v. Int'l Bus. Mach. Corp.,* 33 F.3d 194, 201 (3d Cir. 1994) ("[T]o have standing to bring a private antitrust action, the plaintiff must

show 'fact of damage,' defined as some harm flowing from the antitrust violation."). To show a cognizable antitrust injury, a plaintiff must allege that he suffered an injury that: "(1) is of the type the antitrust laws were intended to prevent and (2) flows from that which makes defendants' acts unlawful." *Andela v. Am. Ass'n for Cancer Research*, No. 10-1468, 2010 WL 2893625, at *3 (3d Cir. 2010).

### C. The Amended Complaint

The Amended Complaint alleges, generally, that "defendants acted in concert to deprive [plaintiff] of his ability to practice his trade and thus eliminate him as a competitor." (Am. Compl., ¶ 165). Such allegations, without more, are wholly insufficient to state a section 1 claim that is plausible on its face. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). To be clear, the Amended Complaint fails to allege, *inter alia:* (a) the existence of an antitrust injury, (b) the relevant product market, (c) the relevant geographic market(s), or (d) enough facts to "raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement" between any of the Defendants. *Twombly*, 550 U.S. at 556. Count Two of Plaintiff's Amended Complaint is therefore dismissed without prejudice.[9] *See, e.g., id.*, 550 U.S. at 556-57 (dismissing section 1 claim and noting that "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

---

[9] Having found that Plaintiff has failed to plead a viable claim for violation of section 1 of the Sherman Act, 15 U.S.C. § 1, the Court declines to address the statute of limitations arguments raised by Defendants in support of dismissal of this claim. Defendants are free to renew such arguments if Plaintiff chooses to re-plead this claim.

### 3. Remaining Claims

Having found that Plaintiff's Amended Complaint fails to state a viable section 1985(3) and/or section 1 Sherman Act claim, the Court finds federal subject matter jurisdiction to be lacking. Count Three alleges a violation of a state statute, N.J.S.A. 2A:47A-1 ("False complaints of unprofessional conduct"). Count Four contains a common law claim of negligent and/or intentional infliction of emotional distress. Finally, Count Five contains a Declaratory Judgment Act claim[10] pursuant to 28 U.S.C. § 2201,[11] which does not provide an independent ground for federal subject matter jurisdiction. *See Exxon Corp. v. Hunt*, 683 F.2d 69, 73 (3d Cir. 1982) ("[A] declaratory judgment complaint does not state a cause of action arising under federal law when the federal issue is in the nature of a defense to a state law claim.").

Absent any federal claims, this Court declines to exercise supplemental jurisdiction over the remaining state law claims (Counts Three and Four) and the Declaratory Judgment Act claim (Count Five). *See* 28 U.S.C. § 1367(b). Judicial economy dictates that there is no significant interest served by adjudicating these claims in federal court at this time. Such claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

---

[10] Plaintiff seeks a declaration that "the accusations of sexual misconduct have not been proven against him and that, until and unless these accusations have been proven by competent evidence in a court of law, they may not be and should not have been reported to either" the New Jersey State Board of Medical Examiners or the National Physician Databank. (Am. Compl., ¶ 181).

[11] Section 2201 provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

## **CONCLUSION**

For the reasons set forth above, Plaintiff's Amended Complaint is dismissed, in its entirety, without prejudice. Plaintiff has thirty (30) days in which to file a Second Amended Complaint that cures the pleading deficiencies in Counts One and Two, as discussed above.[12] Plaintiff's failure to do so will result in dismissal of Counts One and Two of the Amended Complaint, *with* prejudice.

To the extent Plaintiff attempts to cure any of his claims by relying on facts scattered throughout any of his complaints, Plaintiff is hereby directed to amend such claim(s) in a manner that will provide Defendants (and the Court) with adequate notice as to the specific facts upon which *each* claim is based.

An appropriate Order accompanies this Opinion.


DATED: September 17, 2012                                s/ Jose L. Linares
                                                         Jose L. Linares
                                                         United States District Judge

---

[12] If, within thirty (30) days, Plaintiff chooses to file a Second Amended Complaint that provides the Court with a basis for exercising federal subject matter jurisdiction, Plaintiff may reassert the state law claims contained in his Amended Complaint.