**NOT FOR PUBLICATION**                                                      **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VITO MAZZOCCOLI, M.D. ) | Civil Action No. 12-2168 |
| Plaintiff, ) | |
| v. ) | **OPINION** |
| MERIT MOUNTAINSIDE LLC ) | |
| d/b/a MOUNTAINSIDE HOSPITAL, ) | |
| THERESA A. SOROKO M.D., ) | |
| ROBERT W. BRENNER M.D., ) | |
| and J. DOES Nos. 1 through 10, ) | |
| Defendants. ) | |

This matter comes before the Court by way of motions to dismiss Plaintiff's Second

Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by

Defendants Merit Mountainside LLC d/b/a/ Mountainside Hospital ("Mountainside"), Theresa

A. Soroko, M.D., Robert Brenner, M.D., and AHS Hospital Corp./Mountainside Hospital

Campus ("AHS")[1]. *See* Docket Entry Nos. 34 and 36. The Court has considered the

submissions made in support of and in opposition to the instant motions and decides the matter

without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the

---

[1] AHS is not listed as a Defendant to this action. *See* SAC at ¶¶ 30-40. However, "[p]rior to
June 1, 2007, Mountainside Hospital was owned and operated by AHS during which time Dr.
Brenner was an administrative employee of AHS and Dr. Soroko was a member and officer of
the 'medical staff.' AHS sold Mountainside Hospital to defendant Merit Mountainside LLC
('Merit') in a transaction which closed on or about June 1, 2007. The allegations in this action
span the years 2003-2011, covering years before and after AHS sold Mountainside Hospital to
Merit. Dr. Brenner left Mountainside Hospital in 2006." Docket Entry No. 36 at 1.

reasons that follow, Defendants' motions to dismiss are granted. Plaintiff's Second Amended Complaint is hereby dismissed with prejudice.

## I.   BACKGROUND

### A.   Relevant Facts[2]

Plaintiff is a solo practitioner with a principal place of business at 73 Bloomfield Avenue, Caldwell, New Jersey. SAC at ¶ 29. Plaintiff is a Fellow of the American Academy of Family Physicians and possesses more than 20 years of experience as a researcher, surgeon, and primary care physician. SAC at ¶ 53. In addition, he has written extensively and his research and writings have been published in multiple languages in scientific journals in the United States and Europe. SAC at ¶ 54. Plaintiff alleges that his "skills or dedication as a physician [have not] been cast into doubt in any jurisdiction where he has been licensed to practice." SAC at ¶ 55. And, he has received numerous commendations for "his dedication to patient care and professional skills." SAC at ¶ 56.

Plaintiff holds full unrestricted admitting privileges in the departments of family medicine at the following hospitals: Morristown Medical Center, Clara Maass Medical Center, Meadowlands Hospital Medical Center Columbus LTACH, and Saint Barnabas, where he is Associate Clinical Chairperson of the Department of Family Medicine. SAC at ¶ 51. In addition, Plaintiff holds full unrestricted admitting privileges in the following nursing homes and rehabilitation facilities in New Jersey: Canterbury (Cedar Grove), Cedar Hill (Cedar Grove), Clara Maass Continuing, Crane's Mill (West Caldwell), Green Hill (West Orange), Stratford Manor (West Orange), Van Dyk (Montclair), and West Caldwell Care Center (West Caldwell). SAC at ¶ 52.

---

[2] For purposes of the current motions, the Court accepts as true each of the facts set forth in Plaintiff's complaint. *See Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).

In December 2003, Plaintiff was granted privileges at Mountainside as an attending physician in the Department of Family Practice. SAC at ¶ 58. Plaintiff alleges that Dr. Brenner was a person of "considerable influence" at the hospital at that time and was a senior administrator, Chairman of the Department of Family Practice, and Director of Business Development. SAC at ¶¶ 61-62. "Dr. Brenner was unhappy when Dr. Mazzoccoli joined Mountainside, especially because Dr. Mazzoccoli was an experienced physician who was not under [Dr.] Brenner's direct supervision or oversight." SAC at ¶ 66. In addition, Plaintiff's admission meant more direct competition for "Dr. Brenner's own family practice and for ER patients," as well as increased competition by virtue of his inclusion on Mountainside's "on-call Emergency Room Roster." SAC at ¶¶ 67-70.

Plaintiff alleges that that Dr. Brenner actively kept Plaintiff from the Emergency Room roster for approximately one year by using a "multitude of excuses." SAC at ¶ 71. In addition, Plaintiff alleges that Dr. Brenner singled him out, began calling him at his office to "berate him and hurl bizarre accusations at him while Dr. Mazzoccoli was seeing patients," and Dr. Brenner threatened to report Plaintiff to "committees for the baseless, unspecified petty crimes of which Dr. Brenner suspected him." SAC at ¶ 72. Through these actions, Dr. Brenner allegedly made clear his intention to have Plaintiff "thrown out of the hospital" by whatever means necessary. SAC at ¶ 73. Plaintiff claims Dr. Brenner's conduct was enabled by Mountainside's deeply rooted hostility toward foreign-born, immigrant doctors. SAC at ¶ 74. Plaintiff was born in Italy, immigrated to the United States, and speaks with a noticeable accent. SAC at ¶¶ 24-26.

In March 2005, Plaintiff contacted Dr. Eugene Pugatch, President of the Medical Staff Office at Mountainside, regarding Dr. Brenner's "barrage of accusations and harassment." SAC at ¶ 75. Dr. Pugatch allegedly advised Plaintiff that Dr. Pugatch could either appoint a

3

committee to investigate Plaintiff's complaints or personally intervene and request that Dr. Brenner apologize for his behavior and stop harassing Plaintiff. SAC at ¶ 76. Plaintiff chose the second option and received an apology from Dr. Brenner. SAC at ¶¶ 77-78. Plaintiff alleges that this incident led to increased tension and animosity between Plaintiff and Dr. Brenner. SAC at ¶ 78.

Shortly thereafter, Dr. Brenner launched a campaign throughout the hospital, "encouraging nurses, aides, case managers, social workers, and others to report on [Dr.] Mazzoccoli's every action." SAC at ¶ 79. Dr. Brenner's largest supporter in this campaign was his "friend and lover," Dr. Theresa Soroko. SAC at ¶ 80. Dr. Soroko had not met Plaintiff at this point, but Dr. Soroko still claimed that Plaintiff should have been thrown out of the hospital for contacting Dr. Pugatch, should lose his license to practice medicine, and should be forced to earn his living by begging on the street. SAC at ¶ 81.

In February 2006, the harassment allegedly continued. *See* SAC at ¶ 82. Dr. Brenner filed a complaint with Mountainside claiming that Plaintiff fraudulently back-dated notes in a patient's charts. SAC at ¶ 82. Plaintiff misunderstood the dating protocol and did not clearly identify when the note was made. SAC at ¶ 89. Dr. Pugatch appointed a committee to investigate this incident, and the committee concluded that Plaintiff had "incorrectly (not fraudulently) entered a date on the patient's chart by erroneously dating notes with the dates the notes referred to rather than the dates the notes were made." SAC at ¶¶ 85-86. In order to prevent other indiscretions, the committee decided to supervise Plaintiff's charts for a minimum of six months. SAC at ¶ 90. The committee also allegedly concluded that Dr. Brenner's conduct during the investigation was inappropriate as he acted prosecutorial and was seeking "his own

4

brand of justice." SAC at ¶ 87.  Plaintiff claims that these findings angered Dr. Brenner and Dr. Soroko.  SAC at ¶ 88.

Dr. Pugatch presented these finding to the Medical Executive Committee in April 2006. SAC at ¶ 92.  During this meeting, Dr. Brenner allegedly behaved irrationally.  *See* SAC at ¶¶ 93-94.  Dr. Brenner insisted that Plaintiff should have had his privileges withdrawn and should have been terminated from the Department of Family Practice.  SAC at ¶ 93.  In addition, Dr. Brenner insisted that Plaintiff be reported for criminal Medicare fraud.  SAC at ¶ 94.  In light of these comments, Dr. Pugatch requested that Dr. Brenner recuse himself from the meeting.  SAC at ¶ 95.  Dr. Brenner stormed out of the meeting and resigned shortly thereafter.  SAC at ¶¶ 97, 99.  Dr. Soroko blamed Dr. Brenner's departure on the Plaintiff, and Dr. Soroko became very distraught.  SAC at ¶ 100.

On January 1, 2007, Dr. Durgesh Mankikar took over as President of the Medical Staff Office.  SAC at ¶ 102.  Dr. Mankikar allegedly invited Plaintiff to a meeting on February 2, 2007.  SAC at ¶ 103.  Dr. Soroko also attended the meeting.  SAC at ¶ 104.  At this meeting, Plaintiff was informed that there were "deficiencies" in his recordkeeping and that his recordkeeping would be monitored for an additional six months.  SAC at ¶ 105.  Shortly after this meeting, Plaintiff met privately with Dr. Mankikar who allegedly informed Plaintiff that, "You are going to have problems with *them*.  I am trying my best to try to help you, but now *they* found another case against you."  SAC at ¶¶ 108-09.  In the SAC, Plaintiff explained that he interpreted "them" to mean Drs. Soroko and Brenner.  SAC at ¶ 110.

On February 4, 2007, Plaintiff was notified of an upcoming peer review, which was allegedly prompted by "additional complaints."  SAC at ¶¶ 112-13.  Plaintiff did not participate in this April 4th peer review because the hospital did not provide him with sufficient notice about

the specifics of the alleged complaints. SAC at ¶ 114. Plaintiff notes that prior to this meeting, on March 8, 2007, AHS attorneys reported Plaintiff to the New Jersey State Board of Medical Examiners. SAC at ¶ 116. On April 21, 2007, Plaintiff alleges that Dr. Mankikar advised him that he should relinquish his privileges at Mountainside or face another investigation for unspecified charges. Plaintiff refused to resign. SAC at ¶¶ 119-21.

Subsequently, AHS sold Mountainside, and Dr. Mankikar was replaced by Dr. Soroko, who became acting President of the Medical Staff Office. SAC at ¶¶ 122-23. After assuming this role, the hospital created a new "investigating committee" to investigate Plaintiff's conduct. SAC at ¶¶ 124. The committee investigated Plaintiff's interaction with an elderly patient's family.[3] SAC at ¶ 126. The committee demanded that Plaintiff "undergo anger management and attend medical record professionalism and ethics training at his own expense." SAC at ¶ 129. Plaintiff allegedly acquiesced but never actually complied with their demands. SAC at ¶ 130, 145. During this time, Plaintiff alleges that Dr. Soroko continued to contact him and would either threaten him or state that she wanted to help Plaintiff. SAC at ¶ 131. Dr. Soroko also encouraged Plaintiff to leave the hospital and indicated that his departure could lead to Dr. Brenner's return. SAC at ¶ 133. Plaintiff claims to have suffered mental and emotional distress as a result of Dr. Soroko's communications. SAC at ¶ 135.

On February 14, 2008, Dr. Soroko allegedly contacted the New Jersey State Board of Medical Examiners to notify them that Mountainside had instituted a second investigation into

---

[3] Plaintiff explained that he was contacted by an "irate family member of an elderly patient who wanted the patient's care to be managed by the patient's pulmonologist." SAC at ¶ 126. Plaintiff tried to explain the distinctions between a family medicine physician's management of a patient and that of a specialist to this individual, but the individual insisted that her father's case should be managed by a specialist. SAC at ¶ 127. Plaintiff therefore arranged the "orderly transfer" of the patient to the specialist at the daughter's request. SAC at ¶ 127. The committee allegedly investigated Plaintiff's interactions with this family member and "found no need to take any action against [Plaintiff]." SAC at ¶ 128.

the allegations that Plaintiff had backdated medical records, as well as the instance regarding

Plaintiff's alleged inappropriate interaction with the elderly patient's family. *See* SAC at ¶ 139.

Dr. Dadaian, the chairmen of the investigation committee referenced in Dr. Soroko's letter,

contacted the Board of Medical Examiner to notify them that Dr. Soroko's letter was

"inaccurate" as there was no evidence Plaintiff had backdated medical records. SAC at ¶ 142.

On January 21, 2008, C. Barry Dykes, the President of Mountainside, notified Plaintiff

that the Medical Examination Committee recommended revoking Plaintiff's privileges as

Plaintiff had not undergone the training Plaintiff promised to attend. SAC at ¶ 144-45.

Mountainside scheduled a "fair hearing," but Plaintiff had a conflict with jury duty, so the

hearing was canceled. SAC at ¶¶ 146-48. Thereafter, on May 21, 2008, Plaintiff was notified

that the committee wanted him to participate in anger management and undergo chart review for

two years. SAC at ¶ 149. Plaintiff also alleges that he was removed from the "Emergency Room

on-call roster for a period of six months," without explanation. SAC at ¶¶ 151-52. Dr. Soroko

continued to harass Plaintiff following these sanctions. SAC at ¶ 154.

In April 2010, Plaintiff visited a 92-year old patient who was in kidney failure. SAC at ¶

156. Plaintiff alleges that he had previously convinced the patient to undergo kidney dialysis,

but the patient now refused to move forward with the procedure. SAC at ¶ 157. Plaintiff

explained the risk of not treating this condition, and "used humor to set the patient at ease about

the procedure, which would be performed by the plastic surgeon." SAC at ¶ 159. In doing so,

Plaintiff allegedly joked that the procedure was less complicated than a breast implant or facelift.

SAC at ¶ 160. Plaintiff eventually convinced the patient to move forward with the procedure.

SAC at ¶ 161. Plaintiff then left the room along with a nurse's aide and student. SAC at ¶ 164.

7

After leaving, the aide asked Plaintiff why Plaintiff would "mention a breast implant to such an old woman. If she was young like me, I would have understood." SAC at ¶ 166. Plaintiff alleged responded that, "No, I was not mentioning that to propose she have a breast implant. Why? Are you thinking of having a breast implant?" SAC at ¶ 167. Plaintiff indicated that the aide then became angry, approached Plaintiff, and said "I don't need a breast implant. See, this is all mine, it's natural." SAC at ¶ 168. Plaintiff realized he might have angered her, and alleged touched her briefly on her ribcage and apologized. SAC at ¶ 169. A nurse at the other end of the hallway questioned why the aide would let him touch her, and the aide allegedly responded that, "It's good, we're friends." SAC at ¶¶ 170-71. Plaintiff then left. SAC at ¶ 172.

Plaintiff alleges that, later that afternoon, he received a call from Dr. Soroko stating that the aide had accused Plaintiff of "grabbing, fondling and/or kneading her breasts" during their exchange earlier that day. SAC at ¶ 173. Plaintiff was asked to meet Dr. Soroko and Karen Palatella, Chief Compliance Officer for Mountainside, in Dr. Soroko's office. SAC at ¶ 176. Plaintiff attended and explained the events of that morning. SAC at ¶ 177. After the meeting, Dr. Soroko allegedly continued to harass Plaintiff and reported this incident to the New Jersey State Board of Medical Examiners. *See* SAC at ¶¶ 178-79.

Plaintiff attended a Medical Examination Committee meeting on April 13, 2010 to explain his interactions with the nurse's aide. SAC at ¶¶ 181-82. Afterwards, he was scheduled to reappear at an April 20, 2010 meeting to answer additional questions. SAC at ¶ 183. Prior to this meeting, he was notified that his privileges had been suspended. SAC at ¶ 184. On April 23, 2010, Mountainside notified the New Jersey Board of Medical Examiners that Plaintiff had been suspended for "making inappropriate physical contact with a Hospital employee." SAC at ¶ 185. His conduct was also reported to the National Practitioner Data Bank as "sexual

misconduct." SAC at ¶ 186.  Plaintiff alleges that he was contacted by Dr. Soroko after his privileges were suspended and Dr. Soroko apologized that this happened.  SAC at ¶ 187.  Dr. Soroko also recommended that Plaintiff settle with the nurse's aide to avoid litigation as "these employees consider the hospital and you like cows from which they can milk lots of money." SAC at ¶ 191.  Plaintiff refused to settle and instead sued the nurse's aide in a separate state court proceeding.  *See* SAC at ¶ 196.

**B.**    **Procedural History**

Plaintiff brought the present action against Defendants on April 11, 2012 alleging violations of his civil rights (Count One), the Sherman Act (Count Two), and New Jersey statutes and common law.  *See* Docket Entry No. 1 at 28-30.  Plaintiff amended his complaint on April 25, 2012, and, shortly thereafter, Defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(6).  *See* First Am. Comp. (Docket Entry No. 4); *see also* Docket Entry Nos. 10, 11.  The Court granted these motions on September 17, 2012, and informed Plaintiff that he had "thirty (30) days in which to file a Second Amended Complaint that cures the pleading deficiencies in Counts One and Two."  *See Mazzoccoli v. Merit Mountainside LLC*, No. 12-2168, 2012 U.S. Dist. LEXIS 132220, at *24 (D.N.J. Oct. 17, 2012).  On October 17, 2012, thirty-one days after Plaintiff's First Amended Complaint was dismissed without prejudice, Plaintiff filed his Second Amended Complaint.[4]  *See* SAC at 43.  Defendants moved to dismiss the SAC arguing that Plaintiff failed to cure fatal defects in the First Amended Complaint.  *See*

---

[4] Defendants argue that, by operation of the Court's September 17, 2012 order, Plaintiff's "untimely Second Amended complaint must now be dismissed."  Docket Entry No. 36 at 12-13. Plaintiff is pro se and was operating under a good-faith, although erroneous, belief that he had until October 17, 2012 to file his response.  *See* Pl. Br. at 4 (stating that, under Fed. R. Civ. P. 6, the "30-day period commenced running on September 18 and plaintiff filed his SAC within the allotted time.").  Accordingly, in light of Plaintiff's pro se status, and based on the Court's inherent authority to manage its docket, the Court will not dismiss the SAC as untimely.

Docket Entry No. 34 at 37; *see also* Docket Entry No. 36 at 1. For the reasons discussed below, the Court agrees and grants Defendants' motions to dismiss the Second Amended Complaint.

## II.     LEGAL STANDARD

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "courts are required to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party." *Phillips*, 515 F.3d at 231 (citing *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 215-16 (3d Cir. 2002)). But, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts are not required to credit bald assertions or legal conclusions draped in the guise of factual allegations. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Thus, a complaint will survive a motion to dismiss if it contains "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III.     ANALYSIS

### A.     Count One – Section 1985(3) Claim

In Count One of the Second Amended Complaint, Plaintiff alleges that Defendants conspired to deprive him of the "equal protection of the law by engaging in fraudulent, unlawful peer reviews []; by engaging in anti-competitive acts; by conspiring to slander and malign his personal and professional reputation; and by seeking to deprive him of his good name and

livelihood." SAC at ¶ 208.  Plaintiff further alleges that the "motivating force behind these

malevolent acts was precisely the invidious discrimination to which § 1985 relates," "prejudice

against foreign born, immigrant physicians."  *See* SAC at ¶ 209.

Section 1985(3) prohibits conspiracies directed at "depriving, either directly or indirectly,

any person or class of persons of the equal protection of the laws, or of equal privileges and

immunities under the laws."  42 U.S.C. § 1985(3).  This statute does not apply to "private

conspiracies that are aimed at a right that is by definition a right only against state interference,

but applies only to such conspiracies that are aimed at interfering with rights . . . protected

against private, as well as official, encroachment."  *Bray v. Alexandria Women's Health Clinic*,

506 U.S. 263, 268 (1993) (citing *Carpenters v. Scott*, 463 U.S. 825, 833 (1983)) (quotations

omitted).  To date, the Supreme Court has only recognized two rights that are protected against

private encroachment: "the right to be free from involuntary servitude and the right to interstate

travel."[5]  *See Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001); *see also Caswell v.*

*The Morning Call, Inc.*, No. 95-7081, 1996 U.S. Dist. LEXIS 14516, at *16 (E.D. Pa. Sept. 30,

1996); *Welch v. Bd. of Directors*, 877 F. Supp. 955, 959 (W.D. Pa. 1995).

In dismissing Plaintiff's First Amended Complaint, the Court informed Plaintiff that,

"[t]o the extent Plaintiff chooses to amend this claim, . . . 'the Supreme Court has thus far

recognized only [these] two rights protected under § 1985(3)' . . . , neither of which are

---

[5]Plaintiff argues that "§ 1985 (3) does not only apply to questions of involuntary servitude or
interstate travel" and cites to *Perez v. Cucci* and *Startzell v. City of Philadelphia*. *See* Pl. Br. at
17, 20, 35.  Although each of these courts recognized a right to broader protection under this
statute, the alleged conspiracy in each of these cases involved government actors. *See Perez v.
Cucci*, 725 F. Supp. 209, 253 (D.N.J. 1989) (finding that a mayor "acquiesced in plans for
retaliation" against police officers); *see also Startzell v. City of Philadelphia*, 2006 U.S. Dist.
LEXIS 34128, at *11 (E.D. Pa. 2006) (alleging a conspiracy between the defendants and the City
of Philadelphia).  Here, Plaintiff is alleging a purely private conspiracy. *See* SAC at ¶ 208. *See
also Bray*, 506 U.S. at 268 (stating that § 1985 only applies to private encroachment impeding
the "right to be free from involuntary servitude" and "the right of interstate travel").

implicated in Plaintiff's Amended Complaint." *See Mazzoccoli*, 2012 U.S. Dist. LEXIS 132220,

at *18, fn. 8 (citing *Brown*, 250 F.3d at 805).  Plaintiff ignored the Court's guidance and repeated

his allegations from his First Amended Complaint virtually unaltered.  *Compare* First Am.

Comp. at 152-61, *with* SAC at ¶¶ 202-13.  Having failed to allege a § 1985(3) claim that is

plausible on its face, the Court dismisses Plaintiffs § 1985 claim with prejudice.  *See Twombly*,

550 U.S. at 570 ("Because the plaintiffs here have not nudged their claims across the line from

conceivable to plausible, their complaint must be dismissed.").

**B.      Count Two – Sherman Act Claim**

In Count Two of Plaintiff's Second Amended Complaint, Plaintiff alleges that

Defendants "conspired to restrain [Plaintiff] in his trade by subjecting him to a series of sham

peer reviews that led to his expulsion from Mountainside Hospital (the relevant market) and from

the treatment of patients at Mountainside Hospital living in Northern New Jersey (the relevant

geographic market) and surrounding counties."  SAC at ¶ 223.  Although Plaintiff does not

mention the specific section of the Sherman Act at issue here, the Court construes Plaintiff's

argument as alleging unreasonable restraint in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1.

There are four essential elements of a Section 1 claim:  "(1) concerted action by the

defendants; (2) that produced anti-competitive effects within the relevant product and geographic

markets; (3) that the concerted actions were illegal; and (4) that [plaintiff] was injured as a

proximate result of the concerted action."  *Andela v. Am. Ass'n for Cancer Research*, 389 Fed.

Appx. 137, 140-41(3d Cir. 2010) (citing *Howard Hess Dental Labs. v. Dentsply Int'l*, 602 F.3d

237, 253 (3d Cir. 2010)).  In pleading these elements, labels, conclusions, and bare assertions

will not suffice.  *See Twombly*, 550 U.S. at 555-56.  Instead, a plaintiff must assert specific

factual allegations to "raise a right to relief above the speculative level." *Id.* at 555.  For

example, to appropriately plead the first element, a plaintiff is required to submit a "complaint

with enough factual matter (taken as true) to suggest that an agreement was made." *See id.* at

556.

Here, the Court dismissed Plaintiff's First Amended Complaint holding that the

complaint failed to allege "(a) the existence of an antitrust injury, (b) the relevant product

market, (c) the relevant geographic market(s), or (d) enough facts to 'raise a reasonable

expectation that discovery will reveal evidence of [an] illegal agreement' between any of the

Defendants." *Mazzoccoli*, 2012 U.S. Dist. LEXIS 132220, at *21-22 (quoting *Twombly*, 550

U.S. at 556).   Plaintiff's Second Amended Complaint alleges two additional facts that Plaintiff

argues create a "reasonable expectation that discovery will reveal evidence of [an] illegal

agreement." *See* SAC at ¶¶ 107, 110.

First, Plaintiff alleges that Dr. Soroko and Dr. Brenner were friends, allies, and lovers.

*See* SAC at ¶ 107.  In Plaintiff's reply brief, Plaintiff claims that, in light of this relationship,

"one can reasonably and plausibly infer the pair had ample time and opportunity to speak, to

meet, to collectively entertain and enter into any desired agreement, whether tacit or expressed,

with another." Pl. Br. at 8.  Even assuming discovery proved the existence of a romantic

relationship between the doctors, "[m]ere contacts and communications, or the mere opportunity

to conspire, among antitrust defendants is insufficient evidence from which to infer an

anticompetitive conspiracy in the context of the denial of hospital surgical privileges." *See*

*Brown v. Our Lady of Lourdes Med. Ctr.*, 767 F. Supp. 618, 629-30 (D.N.J. 1991) (quotations

omitted); *see also Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 894 (3d Cir. 1981)

("Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place.").

Second, Plaintiff attempts to cure the defects in his First Amended Complaint by interpreting Dr. Mankikar's statement that "You are going to have problems with *them*. I am trying my best to try to help you, but now *they* found another case against you."[6] *See* SAC at ¶ 109. Plaintiff explained that, "[b]y 'them,' Dr. Mankikar made it clear that, although Dr. Brenner was no longer physically present at the hospital, his influence was very much being felt and that he (Brenner) and Dr. Soroko were still actively engaged in the effort to 'get' [Plaintiff]." SAC at ¶ 110. Accepting Plaintiff's interpretation as true, at most Dr. Mankikar's statement offers some evidence that both doctors engaged in similar, parallel efforts to harm Plaintiff. However, "evidence of parallel conduct by alleged co-conspirators is not sufficient to shown an agreement." *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d. Cir. 2010). Parallel conduct must be "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 322 (citing *Twombly*, 550 U.S. at 556-57). Plaintiff does not meet this burden, nor does he offer any evidence that, accepted as true, suggests he could meet this burden. *See Twombly*, 550 U.S. at 556

Therefore, the Second Amended Complaint fails to "raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement" between any of the Defendants. *Twombly*, 550 U.S. at 556. "[C]oncerted action by the defendants" is an essential element of a Section One claim. *See Andela*, 389 Fed. Appx. at 140-41 (citing *Howard Hess Dental Labs.*, 602 F.3d at 253). Plaintiff has not "nudged" this claim "across the line from conceivable to

---

[6] The Court already held that this statement was insufficient evidence of an "illegal agreement." *See Mazzoccoli*, 2012 U.S. Dist. LEXIS 132220, at *21-22.

plausible." *See Twombly*, 550 U.S. at 570.  Accordingly, the Court dismisses Plaintiff's Sherman Act claim with prejudice.  *See Mazzoccoli*, 2012 U.S. Dist. LEXIS 132220, at *24 (stating that failure to cure the pleading deficiencies in the First Amended Complaint would result in dismissal of Count Two, with prejudice.").

## C.    Remaining Claims

Having found that Plaintiff fails to articulate a viable section 1985(3) or Sherman Act claim, the Court finds federal subject matter lacking.  Count Three alleges a violation of a state statute, N.J.S.A. 2A:47A-1 ("False complaints of unprofessional conduct").  *See* SAC at ¶ 229. Count Four contains a common law claim of negligent and/or intentional infliction of emotional distress.  *See* SAC at ¶¶ 232-239.  Finally, Count Five contains a Declaratory Judgment Act claim pursuant to 28 U.S.C. § 2201, which does not provide an independent ground for federal subject matter jurisdiction.  *See* SAC at ¶ 248; *see also Exxon Corp. v. Hunt,* 683 F.2d 69, 73 (3d Cir. 1982) (stating that a "declaratory judgment complaint does not state a cause of action arising under federal law when the federal issue is in the nature of a defense to a state law claim.").  Absent any actionable federal claims, this Court declines to exercise supplemental jurisdiction over the remaining state law claims (Counts Three and Four) or the Declaratory Judgment Act claim (Count Five).[7]  *See* 28 U.S.C. § 1367(b).  Judicial economy dictates that there is no significant interest served by adjudicating these claims in federal court at this time.  Accordingly, these claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## IV.    CONCLUSION

---

[7] Because the Court finds subject matter jurisdiction lacking, the Court will not address the merits of Counts Three, Four, or Five of the Second Amended Complaint.  Accordingly, nothing in this opinion should be construed as precluding Plaintiff from filing these claims in the appropriate state court venue if Plaintiff so chooses.

For the reasons set forth above, Plaintiff's Second Amended Complaint is dismissed in its entirety.  Counts One and Two are dismissed with prejudice, and Counts Three, Four, and Five are dismissed without prejudice.

An appropriate Order accompanies this Opinion.


DATED: December 20, 2012

Jose L. Linares
United States District Judge

16